UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH CARRETHERS,<br><br>        Plaintiff,<br><br>     v.<br><br>BAY AREA RAPID TRANSIT, *et al.*,<br><br>        Defendants.<br>_____/ | No. C-09-1101 EMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR A NEW TRIAL**<br><br>**(Docket No. 117)** |

       Plaintiff Kenneth Carrethers moves for a new trial on his § 1983 claim of excessive force against five Bay Area Rapid Transit ("BART") Police Officers. Docket No. 117. After a six-day trial, the jury returned a verdict in favor of all Defendants on all claims. Docket No. 109. Plaintiff's motion challenges only a portion of the jury's verdict, arguing that the jury's finding of no excessive force was against the clear weight of the evidence. Specifically, Plaintiff argues that clear weight of the evidence presented at trial showed that when Defendants arrested him at the Coliseum BART station on November 15, 2008: (a) Defendants hogtied Plaintiff; and (b) a hogtie is a *per se* excessive use of force. After considering the parties' submissions and oral argument, and for the reasons set forth below, the Court **DENIES** Plaintiff's motion for a new trial.

                                      **I.    DISCUSSION**

A.    <u>Motion for a New Trial – Legal Standard</u>

       Under Federal Rule of Civil Procedure 59(a), "[a] court may, on motion, grant a new trial to all or some of the issues – and to any party – . . . (A) after a jury trial, for any reason for which a

new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). As is clear from the above language,

> "Rule 59 does not specify the grounds on which a motion for a new trial may be granted." Rather, the court is "bound by those grounds that have been historically recognized." Historically recognized grounds include, but are not limited to, claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." [The Ninth Circuit] has held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."

*Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). In considering whether to grant a new trial, "the trial court may weigh the evidence and credibility of the witnesses, [but it] is not justified in granting a new trial merely because it might have come to a different result from that reached by the jury." *Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990) (internal quotation marks omitted). "[A] stringent standard applies when the motion [for a new trial] is based on insufficiency of the evidence. A motion will be granted on this ground only if the verdict is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997).

B.  <u>Excessive Force – Weight of the Evidence Presented</u>

Plaintiff's central argument is that the clear weight of the evidence shows that Defendants hogtied him, and a hogtie is a *per se* excessive use of force. Defendants, in contrast, argue that the evidence varied significantly as to (1) what constitutes a hogtie; (2) whether Plaintiff was hogtied, according to that definition; and (3) whether such a restraint was unreasonable, and that the weight of the evidence favors the jury's determination.

On balance, it is a close call whether the clear weight of the evidence favors Plaintiff. Although the independent testimony at trial was more in Plaintiff's favor than in Defendants', the testimonies of the witnesses conflicted and thus presented a quintessential case for credibility determination by the jury. Taking the entirety of the testimony and evidence into account, the Court concludes that this case is one which another reasonable jury might have decided differently from this jury or in which the Court sitting as a bench trial might have reached a different conclusion; but

2

it is not "quite clear that the jury has reached a seriously erroneous result." *EEOC*, 115 F.3d at 680. The Court so concludes for several reasons.

First, there were numerous competing definitions of what constitutes a hogtie as opposed to acceptable methods of restraint. On one end of the spectrum, there was evidence that hogtying would include any restraint that connected bound feet to bound hands, in which the person restrained is not able to lie completely prone on the ground. For example, Sergeant Wong confirmed a description of someone who is hogtied as "anybody who's just not laying flat, but who's bent up and contorted." Wong Testimony, Docket 125, at 23. Most credibly, BART Chief Gee testified that a hogtie occurred when a hobble–a leg restraint that keeps one from moving his legs separately–is "attached to the suspect's handcuffs to the extent where it force[s] the body to contort . . . so that . . . he would not be able to lie fully prone . . . on the ground." Gee Testimony, Larsen Decl., Docket No. 127, Ex. A, at 51. However, it is not clear from the record how far one's body must be "contorted" under Chief Gee's definition in order to be a hogtie, as Chief Gee also confirmed Defense counsel's definition of a restraint in which "the body is bent almost into a U, where the hands are brought back to the legs." *Id.* at 52.[1]

Other testimony challenged a broad definition of a hogtie. For example, there was testimony that the mere fastening of the excess hobble cord to the handcuffs does not automatically convert a hobble into a hogtie, so long as it does not contort the body. *See* Wong Testimony at 68 ("Q: Is it excessive force to take the excess strap and attach it to the handcuffs if there is no slack in it? A: That in itself, not necessarily."). In addition, Plaintiff's police practices expert, Lt. Clark, testified that an accepted Total Appendage Restraint Procedure ("TARP") involved "apply[ing] the RIPP Hobble to the legs, and then attach[ing] the hook to the handcuffs, so long as you maintain the body in a prone position, the legs are prone *or only slightly raised*." Clark Testimony, Docket No. 124, at 61 (emphasis added) (responding to the above-quoted hypothetical from defense counsel by stating, "That's one method that's approved."). Lt. Clark confirmed that such a restraint was not a hogtie.

---

[1] Although Plaintiff challenges the "u-shape" description of the hogtie invoked by Defense counsel, *see* Reply at 3-5, two witnesses adopted that description. Wong Testimony at 68; Gee Testimony at 52.

*Id.* at 63. Thus, there was credible testimony in the record that even if Plaintiff Carrethers was not able to lie fully prone on the ground, and even if something was connecting his hobbled feet to his handcuffs, that does not necessarily mean he was hogtied or restrained in some *per se* unacceptable manner.

On the other hand, it is fair to say that the weight of the evidence is that a hogtie exists when the legs are pulled up to a 45-degree angle. Lt. Clark, while equivocal, conceded if the legs were tied to a 45-degree angle, this would be a hog-tie. *See id.* at 136 ("Q: I want you to assume [Ms. Dinkins] said it was at 45 degrees when the slack was out. A: All right. Q: That's not a hogtie, is it? A: It's very close, but it's – but it would be a – it would be a mild hogtie or a high-end hobble."). Such an angle would also meet the definition testified to by Sergeant Wong and Chief Gee.

Second, and more importantly, there was competing testimony as to how Plaintiff was actually restrained and whether such a restraint fit any of the above-described definitions of a hogtie, including the definition which includes the 45-degree angle. Plaintiff himself testified that his legs were tied to his handcuffs such that his legs were "in the bent position," but that he did not "know what degree" they were bent. Carrethers Testimony, Larsen Decl., Docket No. 127, Ex. F, at 34. In addition, he testified that he had not complained of any wrist problems, which the defense asserted would likely have occurred had he actually been restrained in the way he claimed to have been restrained. *See* Carrethers Testimony at 92; Clark Testimony at 47, 49-50. The jury was also aware that Mr. Carrethers had changed certain portions of his testimony between his deposition and trial. Carrethers Testimony at 67-75. Therefore, the jury had reasonable bases to be at least somewhat skeptical of Mr. Carrethers's account.

Defendants, on the other hand, testified that nothing connected Mr. Carrethers's legs to his handcuffs and that they did not hogtie him. *See, e.g.*, Guanzon Testimony at 54-55; Mehserle Testimony at 126, 128-29. Although the jury could have found Defendants less than credible based on their incentive to so testify as Defendants and the fact that they failed to secure any videotapes of the incident to corroborate their stories, the jury was not required to disregard their testimony entirely.

4

Given credibility concerns with respect to both Plaintiff and Defendants, the testimony of two non-party eyewitnesses might have been afforded particular weight. The strongest independent testimony came from Lila Dinkins, a BART civilian station agent. She testified that she saw a rope running between Mr. Carrethers's feet and his handcuffs, such that his legs were bent at about a 90-degree angle; she called this restraint a hogtie. Dinkins Testimony, Larsen Decl., Docket No. 127, Ex. C, at 44-46. However, other witnesses provided a competing explanation for why Ms. Dinkins could have seen Mr. Carrethers's legs at a 90-degree angle. For example, Officer Guanzon testified that Defendants brought Mr. Carrethers's legs up to 90 degrees in order to attach the hobble restraint (but not to tie it to the handcuffs). Guanzon Testimony at 69-70; *see also* Mehserle Testimony at 123-25 (same). Such an account provides one basis on which the jury could conclude that Ms. Dinkins accurately described Mr. Carrethers's position, but that he was not actually *tied* into such a position. While Ms. Dinkins testified she clearly saw the restraint and cuffs were tied together and that once Mr. Carrethers was lifted, his legs straighten toward the ground but was still left at a 45-degree angle (Dinkins Testimony at 64), her testimony conflicted with that of the four officer Defendants.

Furthermore, while Ms. Dinkins initially testified that the officers carried Mr. Carrethers out of the BART station by the strap of the hogtie, she also clarified that there were four officers supporting his body (rather than merely carrying him by a rope) and that she saw some of them holding the rope as they carried him. Dinkins Testimony at 73-74. The officers testified that they did not connect the hobble to the handcuffs, and that they either carried the strap or threw it over Mr. Carrethers's back so as to prevent anyone from tripping on the excess rope. *See* Mehserle Testimony, Larsen Decl., Docket No. 127, Ex. H, at 126, 128-29; Guanzon Testimony at 54, 71-72. Thus, it was reasonable for a jury to conclude that Ms. Dinkins saw a strap of some kind, but that it either was not actually connected between the handcuffs and feet, or that it had so much slack as to negate any conclusion that the restraint was unreasonable. In short, while Ms. Dinkins' testimony provided considerable support for Plaintiff's claim that he was hogtied, the testimony was not invincible.

5

Heath Darnell Cunningham, the second non-party eyewitness, presented a more equivocal account of Mr. Carrethers's restrained position. Mr. Cunningham testified in deposition that he saw Mr. Carrethers "hogtied," and that there was something "connecting his feet to the handcuffs." Cunningham Testimony, Larsen Decl., Docket No. 127, Ex. D, at 51. However, Mr. Cunningham appeared to qualify his testimony while on the stand. For example, while he used the word "hogtie" to describe what he saw both in deposition and at trial, he also admitted on cross-examination that he was not quite sure of the difference between a hobble (which constrains only the ankles) and a hogtie. *See, e.g.*, Cunningham Testimony at 51. As his testimony continued, the only facts he confirmed with certainty were that Mr. Carrethers's arms were cuffed and his legs were bound. Cunningham Testimony at 51-57, 66-67. He was not certain whether, and to what extent, the two were connected. Moreover, he testified that as the officers lifted Mr. Carrethers, Mr. Carrethers's legs went down toward the floor. Cunningham Testimony at 57. This is consistent with Ms. Dinkins's account and arguably provides some support for the defense's position that, at most, any connection between his legs and his handcuffs contained significant slack such that there was no hogtie (if hogtie is defined *e.g.*, as resulting in the legs tied at a 45-degree angle).

Thus, the two independent witnesses offered testimony that supported Mr. Carrethers's claim in many regards, but did not lead the jury to an obvious or inevitable conclusion that Mr. Carrethers was hogtied. Accordingly, even assuming it is *per se* excessive to hogtie someone, there was competing testimony regarding whether Plaintiff was actually so restrained and if so, whether the restraint caused his legs to bend at an angle sufficient to constitute a hogtie.

Given this conflicting testimony, a new trial is not warranted based on the prevailing authority in this Circuit. In *Union Oil*, for example, the Ninth Circuit reversed a district court's decision finding the jury verdict to be against the clear weight of the evidence and granting a new trial where "substantial evidence [] goes both ways on all of the[] points." *Union Oil Co. of California v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003). The court warned that even though a court may weigh evidence in considering a motion for a new trial, "It is not the courts' place to substitute our evaluations for those of the jurors." *Id.* The court thus disagreed with the district court's level of scrutiny, in which it had re-evaluated competing evidence and concluded that

6

the jury misunderstood or mis-applied certain pieces of evidence in reaching a damages award. *See also United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1143 (9th Cir. 1999) (a new trial is inappropriate where "[t]he jury award was not outside the range of evidence presented"); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819-22 (9th Cir. 2001) (reversing the grant of a new trial based in part on the appellate court's finding that the district court had mischaracterized testimony presented to the jury, and that there was some evidence in the record that directly contradicted the district court's conclusions).

Similarly, in *Roy*, the Ninth Circuit reversed the grant of a new trial where the district court had weighed one set of facts – the popularity of the Volkswagon bug's design – over another set of facts about design defects with that vehicle. *Roy v. Volkswagen of America, Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990). The court found that because "each side presented persuasive evidence in support of its position," it was inappropriate for the district court to conclude that one side accounted for the clear weight of the evidence. *Id.* at 1177. The court concluded that the defense's "evidence did not so preponderate that it fell within the discretion of the trial judge to rule that the jury's verdict was against the great weight of the evidence." *Id.*

Thus, the district court's discretion is more limited in cases where, as here, there is conflicting evidence on each side and the case turns on credibility issues. In *Landes*, the Ninth Circuit acknowledged that "the trial court faces a difficult task" in examining a motion for a new trial, and cautioned courts that while their power to set aside verdicts that would result in a miscarriage of justice "has long been regarded as an integral part of trial by jury as we know it[,] [o]n the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987) (quoting 11 C. Wright & A. Miller, Fed. Prac. & Proc. § 2806, at 48-49 (1973)). The court approved of the district court's conclusion that it would be "inappropriate to second guess the trier of fact, at least where I cannot say with assurance (as I cannot in this case) that they could not reasonably have found Landes, Scheinberg and Glikbarg more credible than Neapole or plaintiff's theory more compelling than defendant's." *Id*. at 1372.

7

Thus, where credibility is central to a jury's determination, "[d]oubts about the correctness of the verdict are not sufficient grounds for a new trial: the trial court must have a firm conviction that the jury has made a mistake." *Id.* (citing *Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35 (1944) ("Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.")).

The cases in which courts have granted new trials in the face of conflicting witness testimony have typically involved objective evidence that completely impeaches a witness's credibility, such that the court is justified in disregarding that witness's testimony. For example, a district court in the Southern District of New York granted a new trial to a plaintiff in an excessive force case in which independent medical evidence conclusively refuted the police officers' claims as to how the plaintiff was injured. *Ruffin v. Fuller*, 125 F. Supp. 2d 105, 109-10 (S.D.N.Y. 2000); *Cf. Tortu v. Las Vegas Metropolitan Police Dept.*, 556 F.3d 1075 (9th Cir. 2009) (reversing grant of new trial to defendant officers where the court had improperly favored defendants' testimony over independent medical evidence that supported plaintiff's claim and jury's verdict). Similarly, the First Circuit affirmed the grant of a new trial when the district court concluded that the only eyewitnesses supporting the plaintiff's testimony were not in a position during the struggle to have seen what they claimed to have seen. *Jennings v. Jones*, 587 F.3d 430, 443 (1st Cir. 2009) ("This is not a case of mere conflicting testimony. Nor does it involve a mere question of witness demeanor. The district judge cited clear, objective evidence disproving the witnesses' statements."). In these cases, the court reasonably discounted certain witnesses' testimony in the face of objective evidence that proved such testimony was false.

In contrast, the instant case involved competing witness testimony in which there is no objective evidence that definitively refutes any one witness's claims; rather, the jury was presented with conflicting testimony that it had to weigh largely based on witness, demeanor, motive and credibility. Thus, while Ms. Dinkins' testimony, stated with relative certainty and for which there was no obvious bias against the Defendants, provides reason to doubt the correctness of the jury's verdict, this jury's determination in this case ultimately turned on assessment of credibility in the

conflicting testimonies of eye witnesses. There was no objective evidence impeaching the Defendants' assertions at trial. Although the weight of the evidence on this issue arguably favored the Plaintiff, the Court cannot conclude that the verdict was against the "great weight of the evidence." *EEOC v. Pape Lift, Inc.*, 115 F.3d at 680. Accordingly, the Court **DENIES** Plaintiff's motion for a new trial on his excessive force claim.

## II. CONCLUSION

For the foregoing reasons, Plaintiff's motion for a new trial is **DENIED**.

This Order disposes of Docket No. 117.

IT IS SO ORDERED.

Dated: March 26, 2012

_____
EDWARD M. CHEN
United States District Judge